UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BANK OF RHODE ISLAND,
  Plaintiff,

v.                                          C. A. No. 13-164-M

PROGRESSIVE CASUALTY INSURANCE
COMPANY,
  Defendant.

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Judge.

Bank Rhode Island ("BankRI") lost a civil trial in Rhode Island Superior Court and the jury rendered a multimillion-dollar damages award against it. BankRI is now before the Court seeking its defense costs and indemnification from its insurer. The question presented in this case is whether BankRI's Directors and Officers ("D&O") insurance policy ("Policy") with Progressive Casualty Insurance Company ("Progressive") covers defense costs and/or indemnifies the settlement. More specifically, this Court must decide whether the Policy provides coverage for the loss and, if so, whether the Policy's "Internet Services Exclusion" excludes any coverage. Also at issue is the applicability of the Policy's "Allocation Provision." The Court concludes that the Amended Judgment represents a covered loss, that the Internet Services Exclusion does not apply to significant aspects of the loss but does apply to some aspects of the loss, and that the Allocation Provision governs how the determination is made between covered and uncovered losses.

I. FACTS[1] AND TRAVEL

   A.   **Underlying EMC v. BankRI Litigation in State Court**

Empire Merchandising Corporation and its principal, Joseph Pietrantonio (collectively "EMC"), had been a BankRI (or its predecessor[2]) customer since establishing a checking account there in 1971. In 1983, it established a line of credit with the bank[3] with Mr. Pietrantonio as the only person authorized to borrow from the line of credit.

Beginning around 2003, an EMC employee, Rhonda Hastings engaged in a scheme to embezzle funds from EMC. The state court trial justice, Justice Michael A. Silverstein, in his post-trial motions decision, described the embezzlement scheme as follows:

> With access to and control of EMC's daily cash flow, in or about 2004, Ms. Hastings began to embezzle EMC's funds. As part of her scheme, Ms. Hastings would properly record EMC's sales on the weekly sales and reconciliation reports, but withhold amounts of cash from its bank deposits for her own personal use. During this time, approximately 946 checks were presented for payment to BankRI upon insufficient funds as a result of cash shortfalls in EMC's accounts.
>
> In an attempt to conceal the fact that she had been diverting monies generated from EMC's daily operations, Ms. Hastings obtained online access to EMC's line of credit and transferred funds to its operating accounts. In so doing, Ms. Hastings was able to substitute missing cash with line of credit borrowings and cover checks drawn on these otherwise deficient accounts. Additionally, Ms. Hastings further concealed her scheme by altering and/or manipulating several monthly bank statements from BankRI, various weekly reconciliation reports, Dunbar Armored Services reports, bank deposit tickets, and disbursement checks. Between March 2005 and August 2005, Ms. Hastings maxed-out EMC's $250,000 line of credit with BankRI, and overall, she embezzled approximately $540,000 of EMC's cash.

---

[1] The facts are primarily taken from the state court trial justice's decision on post-trial motions in *Empire Merch. Corp. v. Bancorp Rhode Island*, No. PB 08-3372, 2011 WL 4368923 (R.I. Super., Sept. 15, 2011).

[2] BankRI began in October 1995 when investors agreed to purchase from Fleet Financial Group the Rhode Island-based Shawmut branches being divested as part of the Fleet/Shawmut merger. (https://www.bankri.com/tabid/227/default.aspx) (last visited 5-12-2014.)

[3] The line of credit was renewed and increased over the years.

After discovering that Ms. Hastings had accessed EMC's line of credit, Mr. Pietrantonio contacted BankRI to inform them that an employee had accessed it without his authorization and requested that BankRI forgive the debt. BankRI refused and thereafter continued to charge interest on EMC's balance. On or about January 23, 2006, Bank RI, through counsel, informed EMC and Mr. Pietrantonio that the entire outstanding balance (including interest, attorneys' fees, and costs) was immediately due and payable. BankRI informed EMC and Mr. Pietrantonio "that if the Indebtedness ... [was] not paid to BankRI in full via certified funds or bank check on or before March 8, 2006, BankRI [would] exercise its rights and remedies to collect the Indebtedness from each of [EMC] and [Mr. Pietrantonio]."

In the aftermath of Ms. Hastings' embezzlement scheme, EMC required immediate financing in order to continue purchasing merchandise, meeting its ongoing payroll obligations, and paying business expenses. EMC, however, was unable to obtain additional financing. In particular, on or about March 31, 2006, Rockland Trust denied Mr. Pietrantonio's application for a $300,000 loan. Rockland Trust stated that its reason for denying the application was EMC's "inability to provide collateral as [the] existing lender [was] unwilling to release [its] collateral ... [and EMC's] inability to repay the requested loan based on historical operations." Despite a personal loan to EMC from Mr. Pietrantonio in the amount of $75,000 and an additional $100,000 bank loan from Citizens Bank, by the end of 2006, EMC lacked sufficient funding to continue its operations. On January 31, 2007, EMC notified its creditors that of its remaining stores, the Cumberland Store had closed on January 5, 2007, and the Pawtucket Store would close on February 4, 2007.

*Empire Merch. Corp.*, 2011 WL 4368923, at 2-3 (internal citations omitted).

EMC filed a seventeen-count complaint[4] against BankRI in Rhode Island Superior Court in May of 2008[5] alleging "mismanagement of EMC's commercial bank accounts and line of credit, as well as its alleged misconduct in connection with an embezzlement scheme executed by an EMC employee." *Id.* at 2. "One of the bases for EMC's negligence claim was [BankRI's] alleged failure to notify EMC of certain actions committed by EMC employee Rhonda Hastings." (ECF No. 23 at ¶ 9.)

---

[4] The causes of action included breach of contract, estoppel, breach of implied covenant of good faith and fair dealing, negligence, interference with advantageous relations, negligent and intentional infliction of emotional distress, unjust enrichment, and declaratory judgment. (ECF No. 26-1 at 8.)

[5] BankRI gave notice to Progressive of the claim and demanded both defense costs and indemnity.

3

A month-long trial proceeded in Rhode Island Superior Court in February 2011.[6] EMC presented evidence regarding BankRI's failure to notify EMC of the increase in checks returned "insufficient funds," of cash deposits Ms. Hastings made, as opposed to those an armored service usually made, and of deposits made to EMC accounts from Ms. Hastings' personal accounts. (ECF No. 22 at 5-6.) The evidence also showed that "Ms. Hastings' transfers from the line of credit to cash accounts were made exclusively through the banks' internet banking system." (ECF No. 26-1 at 7.)

The jury returned a mixed verdict. (ECF No. 23-5.) It found for EMC on its breach of written contract claim and breach of implied covenant of good faith and fair dealing, finding "BankRI breached its 'business loan agreement' with plaintiffs by providing online access to Ms. Hastings," but finding that BankRI did not breach its "deposit account agreement." (*Id.* at 1-2.) It also found for EMC on its negligence claim, finding that "BankRI breached its duty of ordinary care owed to Plaintiffs," but again finding that it did not breach its "deposit account agreement." (*Id.* at 3.) It also found 15% comparative fault by EMC. (*Id.* at 4.) Finally, it found for EMC on its "Intentional Infliction of Emotional Distress" claim. (*Id.* at 5.)[7] The jury awarded $1,415,047 as the value of EMC's business that was lost, $147,960 for Mr. Pietrantonio's lost wages, and $347,718.47 for his emotional distress. (*Id.* at 8.)

### B. BankRI's Insurance Policy and Claim Against It

Progressive issued a claims-made D&O Policy to BankRI, effective during the pertinent time period from June 1, 2005 through June 1, 2008. (ECF No. 23 at ¶ 1.) The Policy includes an Entity Errors and Omissions Liability Endorsement that provides up to $5 million of coverage

---

[6] Progressive, BankRI's insurer, engaged an attorney, who was present in the courtroom and observed portions of the trial of the EMC litigation.

[7] The jury also found in favor of EMC on BankRI's counterclaims (ECF No. 23-5 at 6-7) and in favor of Steven Labush (an individually named defendant) on both counts against him. (*Id.* at 9-10.)

4

per claim for losses resulting from claims arising from "Wrongful Acts" made during the policy period. (*Id.* at ¶ 2.) The Policy defines "Wrongful Acts" to include "any actual or alleged . . . neglect or breach of duty by the Company or by any person or entity for which the Company is legally responsible." (*Id.* at ¶ 3.) The Policy also contains an "Internet Services Exclusion" that excluded coverage for a loss arising out of "(1) services through the transmission of data to or from an Internet website." (ECF No. 23-2 at 39-40.)

In the face of EMC's initial claim and the resulting Rhode Island Superior Court litigation, BankRI timely notified Progressive of the potential loss. (ECF Nos. 29-9, 29-11.) Progressive informed BankRI that it believed "the vast majority of the Lawsuit is outside the scope of coverage afforded by the policy or excluded from coverage under the Policy [and therefore] it will be necessary for Progressive and the Bank to agree upon a fair and reasonable allocation of defense counsel's fees and expenses between covered and uncovered matters." (ECF No. 29-12 at 7.)[8] BankRI informed Progressive that it did not agree with its assessment of the coverage issues. (ECF No. 29-13.)[9] Nevertheless, the state court case proceeded to trial.

C.  **Travel of this Litigation**

After the state court trial, and knowing Progressive's position on coverage, BankRI filed this four-count action against Progressive.[10] BankRI seeks a declaratory judgment that "Progressive must indemnify [BankRI] for the loss it sustained as a result of the EMC suit, including the amount it was obligated to pay EMC and any costs and legal fees that it has

---

[8] Progressive proposed a 25/75 split of fees and expenses between covered losses and uncovered losses arising from the EMC lawsuit. (ECF No. 29-12 at 7.)
[9] BankRI proposed a 90/10 split. (ECF No. 29-13 at 7.)
[10] Progressive removed the case from state court to this court based on diversity of citizenship.

5

incurred in the EMC suit." (ECF No. 1-1 at 7.) BankRI also filed counts for breach of contract, breach of implied covenant of good faith and fair dealing, and for bad faith.[11]

BankRI moved for summary judgment as to Counts I and II (declaratory judgment and breach of contract) (ECF No. 22), to which Progressive filed an opposition and a cross-motion for summary judgment. (ECF No. 26.) BankRI filed an objection to Progressive's cross-motion (ECF No. 38) and a reply to Progressive's objection to its Motion for Summary Judgment. (ECF No. 39.) Progressive filed a reply to BankRI's objection to its cross-motion. (ECF No. 44.) Both parties filed numerous statements of disputed and undisputed facts. (ECF Nos. 23, 28, 32, 40, 41, 45.) The Court held a hearing on the motions on February 21, 2014.

## II. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure directs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 6 (1st Cir. 2011). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his [or her] favor. *Id.* However, the non-moving party "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). A summary judgment motion cannot be defeated by "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010).

When evaluating "cross-motions for summary judgment, the standard does not change; [courts] view each motion separately and draw all reasonable inferences in favor of the

---

[11] The Court entered an order that it would bifurcate the trial and separate the bad faith claim from the breach claims, but it did not stay discovery on the bad faith claim. (ECF No. 18.)

respective non-moving party." *Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust Fund ex rel. Bolton*, 736 F.3d 33, 36 (1st Cir. 2013) (quoting *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013)).

### III. ANALYSIS

#### A. Applicable Law

Because this case is before this federal court by virtue of diversity jurisdiction, Rhode Island state substantive law applies because Progressive issued the Policy in Rhode Island to BankRI, a Rhode Island corporation. *Rosciti v. Ins. Co. of Penn.*, 659 F.3d 92, 96 (1st Cir. 2011).

Under Rhode Island law, "when the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end. The contract terms must be applied as written and the parties bound by them." *Amica Mut. Ins. Co. v. Streicker*, 583 A.2d 550, 551 (R.I. 1990). In determining whether contract language is clear and unambiguous, a court should interpret "the parties' intent based solely on the written words," and give unambiguous words their "plain and natural meaning." *In Re Newport Plaza Assocs.*, 985 F.2d 640, 645 (1st Cir. 1993) (applying Rhode Island law). Contract language is ambiguous where it is "reasonably susceptible of different constructions." *Westinghouse Broad. Co., Inc. v. Dial Media, Inc.*, 410 A.2d 986, 991 (R.I. 1980). "[W]hen an insurance contract is ambiguous or subject to more than one reasonable interpretation, it will be strictly construed against the insurer." *Sentry Ins. Co. v. Grenga*, 556 A.2d 998, 999 (R.I. 1989); *see also Peloquin v. Haven Health Ctr. of Greenville, LLC*, 61 A.3d 419, 431-32 (R.I. 2013).

B.  **Policy Coverage**

The analysis in an insurance coverage case begins with a determination of whether there is coverage under the provisions of the policy. The insured carries the burden of proof on the initial question of coverage. *Gen. Acc. Ins. Co. of Am. v. Am. Nat. Fireproofing, Inc.*, 716 A.2d 751, 757 (R.I. 1998) (the insured "bears the burden of proving a prima facie case, including but not limited to the existence and validity of a policy, the loss as within the policy coverage, and the insurer's refusal to make payments as required by the terms of the policy.") "[A]ny doubts as to the adequacy of the pleadings to encompass an occurrence within the scope of the policy must be resolved in the insured's favor." *Allstate Ins. Co. v. Russo*, 641 A.2d 1304, 1306 (R.I. 1994) (citing *Employers' Fire Ins. Co. v. Beals*, 240 A.2d 397, 403 (R.I. 1968) (abrogated on other grounds)). After the insured sustains its initial burden, the next step involves a review of any exclusion to the coverage that may apply. The burden shifts to the insurance company to prove the exclusion's applicability. *Gen. Acc.*, 716 A.2d at 757 ("[t]he insurer then bears the burden of proving the applicability of policy exclusions . . . .")

In order to establish coverage and seek indemnification[12] for its loss, BankRI must initially show that the loss it suffered because of the EMC litigation is a covered loss. The duty to indemnify for a covered loss is established from both the facts established at trial and the final determination by the jury. *Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*, 883 F.2d 1092, 1099 (1st Cir. 1989) ("the duty to indemnify is determined by the facts, which are usually established at trial"); *see also e.g., Bankwest v. Fid. & Deposit Co. of Maryland*, 63 F.3d 974,

---

[12] There does not appear to be any dispute about the duty to defend in this case. "[W]hen a complaint contains a statement of facts which bring the case within or potentially within the risk coverage of the policy, the insurer has an unequivocal duty to defend." *Employers' Fire Ins. Co.*, 240 A.2d at 403. "[T]he duty to defend is broader in its scope than the duty of an insurer to indemnify, and its existence does not depend on whether the injured party will ultimately prevail against the insured." *Id.*

978 (10th Cir. 1995) ("the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means (*e.g.,* summary judgment or settlement").).

This D&O Policy contains an Entity Errors and Omissions Endorsement that provides coverage to the insured for a "Loss" resulting from a claim for "Wrongful Acts" for which the insured is legally obligated to pay. "The Insurer will pay on behalf of the Company, Loss in excess of the applicable Retention resulting from Claims first made during the Policy Period against the Company for which the Company is legally obligated to pay for Wrongful Acts." (ECF No. 23-2 at 35.) The relevant terms in the current dispute are "Wrongful Acts" and "Loss."

### 1. *"Wrongful Acts"*

The Policy defines a Wrongful Act as:

any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the Company or by any person or entity for whom the Company is legally responsible.

(*Id.* at 36.)

The plaintiffs in the EMC litigation accused BankRI of, among other matters, negligence and breach of duty. (ECF No. 23-3 at 13-14, Count VI.) At the conclusion of the trial, the jury found that BankRI breached its duty of ordinary care, was negligent, and that this conduct was a proximate cause of the harm to EMC. (*See* "Jury Interrogatory," ECF No. 23-5 at 3 ("Negligence Claim: 1. Do you find that Defendant BankRI breached its duty of ordinary care owed to Plaintiffs? YES . . . 2. Do you find that Defendant BankRI's breach of its duty to plaintiffs was a proximate cause of Plaintiffs' injuries? YES."))[13] Applying the plain and

---

[13] Progressive admits, "[a] portion of the Negligence cause of action made against [BankRI] was potentially covered under the Policy." (ECF No. 28 at ¶ 8.)

9

unambiguous language in the insurance contract to the evidence presented at trial and the jury's verdict, this Court finds that the jury's findings of negligence and breach of duty clearly establish that a Wrongful Act occurred. The verdict demonstrates a finding that BankRI engaged in an act, error, omission neglect, or breach of duty resulting in a loss. Therefore, Progressive's contract with BankRI, absent any exclusion, legally binds it to pay for any Loss suffered by its insured that resulted from the jury's finding of negligence by BankRI. This jury determination triggers Progressive's duty to indemnify BankRI for any Loss.

### 2. *Loss and the "Amended Judgment"*

The jury returned a verdict awarding damages in the EMC litigation totaling $1,415,047 for EMC and $495,678.47 for EMC's principal Joseph Pietrantino. (ECF No. 23-5 at 8.) The Rhode Island Superior Court entered an Amended Judgment against BankRI. (ECF No. 23-7.) The Amended Judgment provides, in part:

> (4) The Plaintiff, <u>EMC recovers from Defendant Bank RI on Count VI</u> of the Complaint (Negligence) in the amount of $1,415,047 which is reduced by 15% pursuant to the comparative negligence statute, R.I.G.L. § 9-20-4, with pre-judgment interest thereon at the rate of 12% as provided by law from March 4, 2005. However, the monetary award is duplicative of the award under Paragraph (3) above and therefore is not additionally assessed against BankRI.

(*Id.* at 2.) (emphasis added.)

Progressive contends that, because the Amended Judgment provides that the amount awarded for the negligence claim is "duplicative" of the amount awarded for the breach of contract claims, BankRI did not suffer a Loss that it is "legally obligated to pay" and therefore there is no coverage available. (ECF No. 26-1 at 20) ("the Bank is not legally obligated to pay any sums to the Underlying Plaintiffs (EMC) for their Negligence award"); (ECF No. 27 at ¶ 31) ("the Court did not assess any damages to EMC on the Negligence cause of action and the Bank did not owe EMC any damages on the Negligence claims.")). BankRI responds that "the

damages owed by [BankRI] on the negligence claims, including prejudgment interest total $2,158,166.01, plus post-judgment interest" because the trial court found, despite separate and distinct causes of action and conduct that gave rise to liability, that EMC's suffered damages were indivisible. (ECF No. 23 at ¶ 31.)

The Court agrees with BankRI. An indivisible injury caused by multiple causes of action does not diminish the recovery available to the insured. The language in the Amended Judgment created a legal obligation for BankRI to pay the amount to EMC because of both the breach of contract counts and the negligence count. (ECF No. 23-7 at 2.) In other words, if the Rhode Island Supreme Court overturned the breach of contract counts, BankRI would still be liable for the full amount of damages because of the negligence and breach of duty findings. Simply because the damages could not be parsed between various causes of action does not change the fact that BankRI suffered a Loss because of the jury's negligence verdict and nor does it relieve Progressive of its obligation to pay the Loss incurred. *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1433 (9th Cir. 1995) ("[The insurer] would be responsible for any amount of liability that is attributable in any way to the wrongful acts or omissions of the directors and officers, regardless of whether the corporation could be found concurrently liable on any given claim under an independent theory.").

BankRI has met its burden of establishing coverage for indemnity based on the damages it incurred resulting from the jury's negligence damages award and the Amended Judgment entered. The Court finds that BankRI incurred a covered Loss based on Wrongful Acts. If the Policy did not contain any coverage exclusion, the Court's inquiry would end here and Progressive would have to indemnify BankRI for the entire Loss. There is such an exclusion, however, so the Court continues its analysis.

11

C. **Exclusion**

The Policy's Internet Services Exclusion requires the Court to decide if it excludes indemnification for any or all of the Amended Judgment. Because BankRI established coverage for the Loss, the burden shifts to Progressive to establish that the Internet Services Exclusion applies. *Children's Friend & Serv. v. St. Paul Fire & Marine Ins. Co.*, 893 A.2d 222, 230 (R.I. 2006).

The Court will first review how courts look at policy exclusion language. Case law directs that the Court must review the exclusion based on how an ordinary reader of the Policy would have understood it. *Sentry Ins.*, 556 A.2d at 999. The Court must be conscious of the directive that Progressive has the burden of proving the exclusion and that any ambiguities in the language of the Policy are "strictly construed against the insured." *Id.* Exclusions should be read narrowly and ambiguities in the applicability of the exclusion should be resolved in favor of coverage, consistent with Rhode Island's general rule favoring coverage in policy interpretations.[14]

With these legal tenets in mind, the Court now turns to the language of the Internet Services Exclusion,[15] which states:

---

[14] The Rhode Island Supreme Court has consistently ruled that inadequacies in the pleadings, any ambiguities, and any policy language interpretations that are capable of more than one reasonable meaning, should all be interpreted in favor of the insured. *Employers' Fire Ins. Co.*, 240 A.2d at 403; *Allstate Ins. Co.*, 641 A.2d at 1306; *Employers Mut. Cas. Co. v. Pires*, 723 A.2d 295, 298 (R.I. 1999); *Peloquin*, 61 A.3d at 431-432.

[15] By their reliance on documents outside the Policy, both parties assert that the exclusion language is ambiguous such that the Court may consider parol evidence in interpreting the insurance contract. *Fram Corp. v. Davis*, 401 A.2d 1269, 1272 (1979); *Supreme Woodworking v. Zuckerberg*, 107 A.2d 287, 290 (1954). For example, Progressive extensively cites offers and opportunities afforded to BankRI to purchase Internet Banking Coverage to support its interpretation of the exclusion. (ECF No. 26-1 at 14-16.) BankRI cites earlier versions of the exclusion to demonstrate that the exclusion only applies to "electronic data that is IN TRANSIT" to support its interpretation of the exclusion. (ECF No. 38 at 3.) The Court finds that the plain

> The Insurer shall not be liable to make any payment for Loss in connection with <u>any Claim arising out of or in any way involving the Company's providing:</u>
> (1) <u>services through the transmission of data to or from an Internet website</u> or private computer network owned, operated or controlled by the Company; or
> (2) website development, software development or network security services to third parties; or
> (3) hosting services or services as an Internet Service Provider, Internet Access Provider, Application Service Provider or provider of like services.

(ECF No. 23-2 at 39-40.) (emphasis added.) Based on this language, the question for the Court is whether Progressive has established that the negligence and breach of duty of ordinary care claims in the EMC litigation "arise[] out of or in any way involve[]" BankRI providing "services through the transmission of data to or from an Internet website." (*Id.*)

Progressive argues that the "Negligence cause of action primarily, if not exclusively, arose from and involved the Bank's on-line services. Thus very little, if any, coverage is even potentially available for any sums incurred by the Bank in connection with that cause of action." (ECF No. 26-1 at 20.) BankRI disagrees, responding that Progressive's assertion that "an extremely small portion of the settlement amount [BankRI] paid would be allocated as a covered loss strains credulity." (ECF No. 39 at 7.)

After a review of the information the parties submitted from the EMC litigation, it is clear that at least some of the negligence claims against BankRI in some way involved providing services through the transmission of data over the internet. For example, the transfer of money from EMC's line of credit through BankRI's internet banking system by an employee not authorized by EMC appears to be the type of claim that falls within a plain reading of the Internet Services Exclusion.

---

language of the policy speaks for itself, although how it is applied may be subject to conflicting interpretations, and thus rejects the parol evidence the parties have offered.

It is equally clear, however, that many of the facts supporting the negligence claims against BankRI do not fall within the exclusion. The essence of the EMC negligence claims appears to be that BankRI failed to notify EMC about suspicious activity taking place within EMC's account and that BankRI breached its duty to EMC to exercise due care in the handling of its account. EMC alleged that BankRI knew or should have known, and therefore should have informed EMC about:

- An increase in returned checks drawn on insufficient funds in EMC's account during the period from August 2004 through September 2005;
- Cash deposits made by an employee of EMC, as opposed to the armored car service previously used by EMC;
- Significant decreases in the amount of EMC's cash deposits, which coincided with the end of the armored car service;
- Deposits made by an employee of EMC from her personal account to cover shortfalls in the EMC account;
- Charges to EMC for fees associated with checks drawn on insufficient funds from an employee of EMC's personal account; and
- Deposits made into an employee of EMC's personal account by EMC employees.

(ECF No. 22 at 3.)

BankRI's allegations of mismanagement of EMC accounts, and others, appear to the Court to form a significant part of the negligence claim that EMC brought against BankRI and represent covered Losses and that fall outside of the Internet Services Exclusion. These claims do not arise out of and are not in any way involved with BankRI providing services through the transmission of data to or from an internet website. Therefore, after a review of the evidence

submitted to date, this Court agrees with BankRI and rejects Progressive's analysis of the application of the exclusion to the facts of this case.[16] The Court finds that the Internet Services Exclusion excludes some portion of the negligence award and it does not exclude other significant portions. In light of this, the Court must turn to the Policy again to answer the question of whether apportionment of the settlement of the Amended Judgment is required between covered and uncovered claims.

### D. Allocation Provision

Generally, "the apportionment of the settlement amounts between covered and non-covered claims is typically resolved through negotiation and private agreement, rather than litigation, as litigation costs can be astronomical." *In re Feature Realty Litig.*, 634 F. Supp. 2d 1163, 1171-72 (E.D. Wash. 2007). Indeed, the Policy's Allocation Provision provides in part:

> B. ALLOCATION - If in any Claim, the Insured Persons incur Loss jointly with others (including the Company if the Claim against the Company is not covered by Endorsement to this Policy) or incur an amount consisting of both covered and uncovered Loss because the Claim includes both covered and uncovered matters, then the Insurer, the Company and the Insured Persons shall allocate such amount as follows:

---

[16] BankRI goes even further in urging the Court to find that the exclusion does not apply at all because "the jury did not identify what specific acts of negligence triggered [the] liability finding [and] Progressive cannot establish as a matter of law that the damages awarded for the negligence claim were based on some conduct excluded from coverage by the Policy's Internet Services Exclusion." (ECF No. 39 at 1.) Moreover, BankRI asserts that Progressive waived any argument in this regard because Progressive saw the jury questionnaire and Amended Judgment and did not object or request that the jury specify the exact act or acts of negligence it found BankRI committed. (ECF No. 22 at 8.)

The Court does not place any significance on Progressive's alleged lack of affirmative action in the EMC litigation to demand a jury finding that would have differentiated between excludable and non-excludable acts. Progressive was not a party to the EMC litigation and it had no way to assert its interest in how the EMC litigation was conducted. Although it had an attorney observing parts of the trial, it had no standing to request the trial justice to mold the jury verdict form to answer the insurance coverage questions. The Court, therefore, does not hold the lack of parsing of the jury's verdict against Progressive.

> (1) 100% of all covered Loss, other than Defense Costs, incurred solely by the Insured Persons or jointly by the Insured Persons and the Company shall be allocated to covered Loss.
>
> (2) all other amounts shall be allocated between covered Loss and uncovered loss based on the relative legal exposures of the parties to covered and uncovered matters. The Insurer, the Company and the Insured Persons agree to use their best efforts to reach a proper allocation of such amounts.

(ECF No. 23-2 at 18.)

However, when the parties are unable "to use their best efforts to reach a proper allocation" (though hope springs eternal that the parties will use their best efforts to reach a proper allocation in this case), they can turn to the Allocation Provision of the Policy for guidance on the allocation process. That provision states:

> If the Insured Persons, the Company and the Insurer cannot agree on an allocation:
>
> ****
>
> (3) the Insurer, if requested by the Insured Persons and/or the Company, shall submit the allocation dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel. The arbitration panel shall consist of one arbitrator selected by the Insured Persons and the Company, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

(*Id.*) The type of situation that the insured and the insurance company are in here appears to be precisely the type of matter that invokes this provision. Because this Court found that there were both covered and uncovered Losses as part of the Amended Judgment and settlement, an allocation must take place.

### IV. CONCLUSION

Plaintiff's Motion for Partial Summary Judgment (ECF No. 22) and Defendant's Motion for Summary Judgment (ECF No. 26) are GRANTED IN PART AND DENIED IN PART. As to Count I (declaratory judgment) the Court finds that:

1. Progressive owes a duty to defend and therefore is responsible for the costs of defense;

2. Progressive owes a duty to indemnify a significant portion of the Amended Judgment that as a covered claim not subject to the Internet Services Exclusion; and

3. The allocation between the covered losses and uncovered losses will be determined either by arbitration pursuant to the Policy or by this Court after further limited discovery.

Plaintiff's partial Motion for Summary Judgment as to Count II is GRANTED with damages to be determined as outlined above.

All other portions of the motions are otherwise DENIED.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

May 15, 2014